BARRETT, (WILLIAMS v.) See Case No. 17,714.

---

## Case No. 1,051.

BARRETT et al. v. WILLIAMSON et al.

[4 McLean, 589.][1]

Circuit Court, D. Ohio. Nov. Term, 1849.[2]

COLLISION—CONFLICTING TESTIMONY — USAGE OF RIVER—MEASURE OF DAMAGES — REPAIRS—LOSS OF TIME—INTEREST.

1. Where there is a conflict in the testimony, the jury must decide on the credibility of the witnesses. This may often depend upon the opportunity witnesses had to observe the facts which they have sworn to. In collision cases witnesses often become excited and alarmed, so as not to be in a condition to see and detail facts with entire accuracy.

2. The law of the river is established by usage, and this must govern those who navigate it. All are presumed to know an established usage, and are expected to conform to it.

[See Halderman v. Beckwith, Case No. 5,-907.]

[See note at end of case.]

3. By this usage a descending boat is required to run in the current near the middle of the river, the ascending boat to keep near the right shore. This being the usage, if either turn out of her course, so as to run into the other, the owners of the boat leaving her track are responsible for the damages done.

[See note at end of case.]

4. The descending boat, by the usage, as appears from the testimony, on seeing the approach of the ascending boat, is required to stop her engine and float, leaving to the other boat a choice of sides. Under such circumstances, in view of the usage, it would be hazardous for the descending boat to back her engine, as that might bring her in contact with the other boat. The descending boat may act upon the presumption that the other boat does not intend to run into her. And any deviation from the established usage might create embarrassment, and, perhaps, cause a collision.

[See note at end of case.]

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Affirmed in 13 How. (54 U. S.) 101.]

5. In such a case, the jury will give a remuneration for raising the injured boat, repairing her, and for her use during the time necessary to fit her for use.

[Followed in Jolly v. Terre Haute Drawbridge Co., Case No. 7,441. Cited in The Morning Star, Case No. 9,817.]

[Contra. See Smith v. Condry, 1 How. (42 U. S.) 28.]

[See note at end of case.]

6. The jury are not bound to give interest, but they will, if they find for the plaintiff, give such damages as they shall deem just.

[See note at end of case.]

[At law. Trespass on the case by Alexander B. Barrett, Robert Clark, Nathaniel D. Terry, Henry Lyne, James D. Donaldson, William Brown, and John B. Sprowle, owners of the steamboat Major Barbour, against Euclid Williamson, Thomas F. Eckert, and John Williamson, owners of the steamboat Paul Jones, for damages caused by collision between the two vessels. Tried by jury. Verdict for plaintiffs.

[Subsequently, the cause was taken to the supreme court on writ of error by the defendants, and the judgment of the circuit court was affirmed. Williamson v. Barrett, 13 How. (54 U. S.) 101.]

Taft & Mallon, for plaintiffs.

Fox & Lincoln, for defendants.

BY THE COURT, (charging jury.) This is a case of collision of two steamboats on the Ohio river. The plaintiff, who owns the steamboat called the Major Barbour, complains, that while his boat was descending the Ohio river, in her right place, the steamboat called the Paul Jones, in ascending the river, being in her right track, near the Indiana shore, left it, turning her bow across the river, ran into the Major Barbour, and crippled her so that she sunk to the bottom, etc., through the fault and negligence of the conductor or pilot of the Paul Jones. As usual in such cases, a great number of witnesses have been sworn, who were on the respective boats, and who contradict each other in their testimony. In order to refresh your minds in regard to the facts, I will state the substance of the testimony in as few words as possible.

Henry J. Spotts commanded the Major Barbour. He was asleep when the collision took place. From the shock he thought the Barbour was much injured. The pilot was directed to make for the Kentucky shore, that being nearest. The boat floated down, and sunk near the Kentucky shore.

John Braker has been a pilot for twenty years. To avoid a collision, the descending boat stops its engine, giving the ascending boat a choice of sides. When very close, it is the duty of both to do all they can to avoid a contact.

John Shalcroft, a pilot, says, if the Major Barbour was near the middle of the river, the Paul Jones hugging the Indiana shore, there was no occasion to stop the engine.

William Richards, G. D. Frazer, and James Matthews, agree with Braker and Shalcroft.

Henry Smith is well acquainted with the river. The Paul Jones was hugging the Indiana shore; the Major Barbour was near the middle of the river, but nearest the Kentucky shore. The Paul Jones took a direction across the river, and struck the Major Barbour, near the middle of the river. Witness is well acquainted with the proper tracks of boats ascending and descending. The Major Barbour was as near right as could be. She stopped both her engines and floated. The Paul Jones was under a full press of steam. After the contact it was more than an hour before the Major Barbour settled on the bottom of the river, near the Kentucky shore.

William Wand was pilot on the Major Barbour, and was on watch when the collision occurred. He saw the Paul Jones pass over to the Indiana shore—turned the Major Barbour nearer the Kentucky shore. The Paul Jones ran square across from the Indiana shore —witness stopped the engine, rang the bell, hailed the boat, rang the big bell. The Paul Jones approached the Major Barbour with such force as to curl the water white at its bow. When very near the Major Barbour, the Paul Jones stopped her engine, made two escapements, but struck the Major Barbour with great force. The Paul Jones was near half a mile out of her course, and was managed unskillfully.

R. C. Slaughter says, the Paul Jones came from the Indiana shore almost directly across the river, bearing up a little. Witness was standing on the starboard side, and as the Paul Jones approached, he ran to the other side of the boat. Immediately after the contact, the Major Barbour commenced sinking —she floated and settled on the bottom near the Kentucky shore. When he first saw the Paul Jones, she was one hundred and fifty yards from the Major Barbour. The shock and crash by the contact were great. The bow of the Barbour pointed down the stream.

Charles C. Molly was on the Kentucky shore, saw the two boats, one ascending, and the other descending, and saw them come together. The Major Barbour was, or appeared to be near the middle of the river, but nearer the Kentucky than the Indiana shore. The Paul Jones seemed to be crossing the river. Her true course was near the Indiana shore. The river at the place was more than eight hundred yards wide.

R. F. Conway was a cabin passenger on the Major Barbour. It was a beautiful, star-light night. Saw the Paul Jones coming into her— hailed her—bells rang. The collision took place near the middle of the river—nearest the Kentucky shore. The Paul Jones was square across the river, rather pointing down it.

Washington Green, an engineer, was on the Major Barbour; saw the Paul Jones coming up the Indiana shore two miles off—laid down —heard the bells, the Major Barbour's engine

was stopped. The Paul Jones was not stopped when within eighty feet of the Major Barbour. The latter was from the Kentucky shore, not more than one third of the distance across the river.

N. S. Moore says, at the place of collision, the river is about eight hundred yards wide. Witness saw the Paul Jones turn across the river. The Major Barbour descending near the middle of it. The Paul Jones was not quite square across the river. To the same effect is the statement of William L. Mitchell.

G. Ostend was an engineer on the Major Barbour, and was on his watch. He stopped her engine, floated some minutes head down stream. The Paul Jones approached nearly square across the river, pointing to the Major Barbour. Two women, one man and two children were drowned. The bell on the Major Barbour, to back did not ring.

John Nestlewood is a pilot; the rule of the river is, for the descending boat to stop its engine, the ascending boat to maneuver.

James Hammond is a pilot, and states the law of the river as stated by the above witness. In certain positions, both boats should stop their engines and back. But when a boat is approaching across the river, as was the Paul Jones, the descending boat could do nothing more than to stop her engine.

George Frazer is a pilot; the line of the descending boat is near the middle of the river; the track of the ascending boat near the Indiana shore. Witness saw the Paul Jones was approaching in a direction to run into the Major Barbour, nearly across the river, and she continued that direction until the collision.

M. Astrander, J. Vanmetre and another witness state the same as Frazer. J. Vanmetre heard the captain of the Paul Jones say, if he had been up the accident would not have happened. Some ten or twelve other witnesses unite in saying that the Major Barbour was descending nearer to the Kentucky than the Indiana shore, and that the Paul Jones turned from the Indiana shore across the river and continued that direction until the collision occurred.

On the part of the defendants several witnesses were examined.

J. McCamment was pilot on the Paul Jones, had stood his watch on steam boats nearly two years. He saw the Major Barbour was going to run into them. Was running near the Indiana shore—could see the stones. The Paul Jones was running straight up the river, when she was struck by the Major Barbour. It was a slanting lick—knocked down the clay and brick on the starboard of the Major Barbour. Witness was backing the Paul Jones when the collision occurred. At the time, the rudder of the Paul Jones was fast on the Indiana shore. If the Major Barbour had run her proper course, the boats would have passed fifty yards apart. He stopped

the engine of the Paul Jones thirty feet before the collision—the engine of the Major Barbour could not have been stopped.

James Kelley was mate of the Paul Jones. He saw that the course of the Major Barbour was unsteady. She seemed determined to run inside of the Paul Jones, next to the shore. At the time of the collision, the Paul Jones was pointed up the river. The course of the Major Barbour was rather quartering. The Major Barbour's lights were so dim that he could not see the upper part of the boat. The boats were three hundred yards apart when the first bell was rung.

Charles Foulkner has been an engineer thirteen or fourteen years, on the Ohio. Was in bed on the Paul Jones when the big bell awoke him—then the bell rang to back the Paul Jones—did so. Heard a man say you will smash the rudder against the shore. The collision took place seventy-five or eighty feet from the Indiana shore. The Paul Jones was in the proper track for that stage of the water.

William Wathral was in his berth on the Paul Jones when the collision took place. He saw the Indiana shore when he first went out. The Paul Jones was in the ascending track. He heard the watchman say to the pilot of the Major Barbour, if you had backed the boat all would have been well. The pilot said he did what he thought was right. Said he was a little confused, but requested the watchman to say nothing about it. After the collision, the Paul Jones backed her stern against the shore. The collision was within fifty yards of the Indiana shore.

Edward Scull says, the Major Barbour came down the Indiana shore about one hundred yards from it. She struck the Paul Jones and then sheared; the bow of the Paul Jones pointed up the stream. She pushed the Major Barbour toward the other shore.

Elisha Marshall, was mate on the Paul Jones. Was called when the bell was rung; were within seventy-five or one hundred yards of the Indiana shore. As the Paul Jones backed she ran against the shore. From the direction of the Major Barbour witness thought she intended to run between them and the shore. Her bow was pointed across the river, and was running nine or ten miles an hour.

George Sutton, was a pilot; a passenger on board the Major Barbour. When the boats struck they were within a hundred yards of the Indiana shore. The Paul Jones was in the usual track. The blow was not heavy; thought the Barbour was not injured. The Major Barbour pointed to the Indiana shore and was within less than one hundred yards of it.

Henry Dayer, the Paul Jones was running within thirty yards of the Indiana shore. The Major Barbour ran against the bow of the Paul Jones; the engineer of the latter was backing his engine at the time. The Major Barbour was under considerable head-

way at the time. He thinks her engine was not stopped. After the collision the Major Barbour turned to the Kentucky shore.

John Chapman, was the carpenter on the Paul Jones. She was heading up stream. The Major Barbour ran near the Indiana shore. One minute after the collision the boats were within one hundred yards of the Indiana shore. The Paul Jones was backing.

L. Leister, was in the Paul Jones. She was close to the Indiana shore. She was in her right place, but the Major Barbour was not. The blow was not heavy. The Paul Jones did not back on the Indiana shore; she backed about one hundred feet. The Major Barbour was pointing down the river and was from one hundred to one hundred and fifty yards from the Indiana shore.

George Lesley, was asleep when the boats struck; about four rods from the Indiana shore. The Paul Jones pushed the Barbour to the place where she sunk. At the time of the collision the Paul Jones was backing her engines.

William L. Holbrook, was a passenger on the Paul Jones. Heard the bell ring, ran out on the star board side; took the boat to be lying up the river half a mile from the Kentucky shore. The Paul Jones was lying straight up the river, the Major Barbour across her bow.

N. Benby, when the boats struck, witness was in his berth, sprung up; saw Dr. Slaughter on board the Paul Jones, seemed not to be in his right mind. Two minutes after the collision the Paul Jones headed up stream, and the Major Barbour was quartering to the Kentucky shore.

William Hinton states that the place of the Major Barbour should have been, by the rules of the river, near the middle, and that of the Paul Jones near the Indiana shore.

Hugh Funk says, a short time after the collision, Wand, the pilot of the Major Barbour, said he was running down near the Indiana shore. Witness inquired why he did not keep the middle of the river, when Wand corrected himself by saying he thought he was in the middle. He said he did not ring the bell to back, that the Paul Jones pushed the Major Barbour to the Kentucky side.

Capt. Ross, who is a pilot, says, in the night an unpracticed eye is liable to be deceived as to the position of a boat in the river, from her lights.

Joseph Ross, has been a pilot for ten years. By the rules of the river the descending boat should float half a mile; the ascending boat takes choice of sides. Each boat should stop her engine under certain circumstances. The force of the engine would be lost in less than one-fourth of a mile. The current of the Ohio is about three miles an hour. A boat that had lost her headway would begin to back the first revolution of her engine. The proper place for the Paul Jones was from fifty to one hundred yards from the Indiana shore;

the Major Barbour's track was near the middle of the river.

The above is a condensed statement of the facts, which will enable you to judge of the merits of this controversy, and to determine it as the justice of the case shall require. There is great conflict in the testimony. The witnesses differ so essentially in their statements, that by no rule of construction can they be reconciled. The conclusion is inevitable, that some of the witnesses have sworn falsely, if not corruptly. Great allowance may be made from the circumstances under which they testify, but this can not include facts stated, not as matter of opinion, as an estimate of distance, but facts under their own observation, and stated without qualification. And there are many such in the case, which have a most important bearing upon its merits. From the nature of the case, and the peculiar responsibility of those who were at the time engaged in navigating the respective boats, much feeling to exculpate themselves might very naturally be expected. But this should not close their eyes or stop their ears. It is the province of a jury to weigh the evidence and judge of the credibility of witnesses. All things being equal, the witnesses who, from their position at the time of the collision, had the best opportunity of seeing the occurrences to which they swear, are more entitled to credit than the relations of those whose opportunity of observation was less favorable. Some of the witnesses saw nothing of the direction of the respective boats, until the moment of collision. Others sprang from their berths under great excitement and alarm, and of course could not have been in a condition to see or relate facts with precision. There are some facts to which there is no contradiction. The Major Barbour was run into by the Paul Jones, so as to cause her to sink in a very short time. She appears to have floated a short distance, after the collision, sinking gradually until she reached the bottom. The place where she sunk was near the Kentucky shore. The river at the place is proved to be about eight hundred yards wide. Now these facts may well call in question the statements of the defendant's witnesses who say that the Major Barbour ran into the Paul Jones, which was very near the Indiana shore, so near that her stern struck the shore, in backing out from the Barbour. And that the Paul Jones had stopped her engine, and was backing at the time the collision occurred.

The consequences of this collision were serious, not only to the Major Barbour, as she was much injured, but to three of her passengers who were drowned. Having called your attention, gentlemen, to the evidence, the court instruct you, that if the Major Barbour was in her proper track, as proved by several of the witnesses, near the middle of the river, and the Paul Jones in ascending the river was in her proper track near the Indiana shore, and she turned out of her proper course across the river, or quartering, in the language of some of the witnesses, so as to threaten a collision with the Major Barbour, and that so soon as this was discovered the Major Barbour stopped her engine, rang her bell and floated down the stream as the custom of the river required, leaving the ascending boat the choice of sides, and this was the law of the river. That on the near approach of the Major Barbour she was not required to back her engine, as that might bring her in contact with the other boat, but might presume that the Paul Jones did not intend to run into her, and that for an injury done to the Major Barbour, under such circumstances, by the Paul Jones running into her, the plaintiff is entitled to recover such damages as appears from the evidence was done to the Major Barbour. That if the Major Barbour turned out of her course, running near the Indiana shore, and this turning out of her course contributed to the collision the plaintiff could not recover. That where both boats were in fault the plaintiff could not recover. That in such case the fault of the Major Barbour must have been such as to have led to or contributed to the collision. That if the collision was the result of an unavoidable accident, the plaintiff could not recover. That should the jury find for the plaintiff, they will give damages which shall remunerate the plaintiff for the expenditure necessarily incurred in raising the boat and in repairing her, and also for the use of her during the time necessary to make the repairs and fit her for business. That the jury were not bound to give interest as claimed by the plaintiff, but they would give such sum in damages as they shall deem just and equitable under the circumstances.

The jury found for the plaintiff $6,714.29 cents.

[NOTE. On writ of error, this judgment was affirmed, the supreme court holding that it would have been erroneous to instruct the jury that the master of the Major Barbour was bound, not only to stop her engines, but to back her, if by so doing the danger could have been avoided; for, before the neglect to make that movement could be charged as a fault, it should have appeared that the master knew the colliding boat intended to pass her bow. In the absence of such knowledge, her proper position was that which the usage of the river prescribed, namely, to stop her engines, and float, leaving the other the choice to pass across either her bow or stern. This was his plain duty, not only from the law of the river, but due, under the circumstances, to the other boat, as affording her the most favorable opportunity to extricate herself from the danger in which she had become involved by her own fault, in carelessly leaving her proper track. The opinion was delivered by Mr. Justice Nelson. Mr. Chief Justice Taney, Mr. Justice Catron, and Mr. Justice Daniel dissented on the ground that no damages should be allowed for the use of the injured vessel during the time necessary to make repairs. Williamson v. Barrett, 13 How. (54 U. S.) 101.]